# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| **TYLER DESOUZA,** on behalf of himself and all others similarly situated,<br><br>      **Plaintiff,**<br> **v.**<br><br>**AEROCARE HOLDINGS LLC; ADAPTHEALTH CORP.,**<br><br>      **Defendants.** | Civil Case No.: 22-cv-1047 |

# PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1
II.   BACKGROUND ................................................................. 1
      A.   Plaintiff's Allegations and Procedural History ................ 1
      B.   Discovery ..................................................................... 2
      C.   Mediation ..................................................................... 3
      D.   The Settlement ............................................................. 4
           1.   Defined Class .......................................................... 4
           2.   Monetary Relief ...................................................... 4
           3.   Redistribution and Cy Pres ..................................... 5
           4.   Release ..................................................................... 5
           5.   Service Awards ....................................................... 5
           6.   Attorneys' Fees and Costs ....................................... 6
           7.   Administration, Notice, and Claims ....................... 6
III.  DISCUSSION ..................................................................... 7
      A.   Legal Standard for Preliminary Approval ..................... 7
      B.   Preliminary approval is warranted. ............................... 8
           1.   There was no fraud or collusion in reaching the settlement. ........... 8
           2.   Success at trial is uncertain ...................................... 8
           3.   The recovery under the settlement is substantial ........................ 10
           4.   Continued litigation would be lengthy, complex, and expensive. . 12
           5.   At this stage, there is no opposition to the settlement. ................. 13
           6.   The case settled early, but at an "inflection" point ....................... 13
IV.   Conditional certification of the Settlement Class is appropriate ............... 14
      A.   Rule 23(a) is Satisfied. ................................................. 15
           1.   Numerosity. .............................................................. 15
           2.   Commonality. ............................................................ 16
           3.   Typicality. ................................................................. 16
           4.   Adequacy. .................................................................. 17
      B.   Rule 23(b)(3) is Satisfied. ............................................ 19
           1.   Predominance. .......................................................... 20
V.    The Notice Program Should be Approved. ............................ 26
VI.   CONCLUSION .................................................................... 27

## I.   INTRODUCTION

Plaintiff Tyler DeSouza ("Plaintiff") respectfully moves the Court for preliminary approval of the class action settlement ("Settlement" or "Settlement Agreement")[1], attached hereto as Exhibit A, between Plaintiff and Defendant Aerocare Holdings LLC ("Aerocare") and Defendant AdaptHealth Corp. ("AdaptHealth"; collectively, "Defendants"; collectively with Plaintiff, "Settling Parties"). The proposed Settlement resolves all class claims in this matter.

Under the Settlement, Defendants have agreed to pay $160 to each of 32,035 class members meeting the class definition and who file an Approved Claim ("Settlement Relief"), a total cash value of $5,125,600. In addition, Plaintiff's efforts made Defendants aware of the purported glitch causing the Post-Stop Messages at issue, preventing a potentially significant number of Post-Stop Messages from being sent to other persons.

## II.   BACKGROUND

### A.   Plaintiff's Allegations and Procedural History

The Florida Telephone Solicitation Act ("FTSA") prohibits a "telephone solicitor" from initiating telephonic sales calls (which includes text messages) to a consumer who has previously asked the solicitor to stop. Fla. Stat. § 501.059(5). The

---

[1] Unless otherwise specified, capitalized terms carry with them the same definitions contained in the Settlement Agreement.

1

Telephone Consumer Protection Act ("TCPA") prohibits "telephone solicitations" to a telephone number on the National Do-Not-Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c). In addition, the TCPA prohibits initiating calls for telemarketing purposes without certain minimum policies and procedures. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d).

On June 14, 2022, Plaintiff filed his initial class action complaint against AdaptHealth alleging that AdaptHealth sent text messages to Plaintiff inviting him to order supplies for a CPAP machine after he asked Defendant AdaptHealth to stop. [Dkt. 1.] After two additional amendments, on September 19, Plaintiff filed a Third Amended Complaint ("TAC"). [Dkt. 28.] The TAC plead, on behalf of putative classes, violations of the FTSA § 501.059(5) and of the TCPA, 47 U.S.C . § 227(c) through § 64.1200(c). On October 3, 2022, Defendants moved to dismiss. At the time of the Mediation Report filed on January 12, 2023, this motion to dismiss was pending. It was denied as moot in the Court's sixty-day order issued on January 19, 2023. [Dkt. 44.]

Also of note, on November 23, 2022, Plaintiff filed a complaint in state court alleging violations of the TCPA, 47 U.S.C. § 227(c) through 47 C.F.R. § 64.1200(d). [Dkt. 42.] This, combined with the TAC, were the operative complaints until, as part of the settlement process, Plaintiff filed a consolidated Fourth Amended Complaint ("FAC") on April 7, 2023. [Dkt. 55.] The FAC names both settling Defendants and adds the claim under 47 C.F.R. § 64.1200(d) that was pending in state court.

### B. Discovery

2

This case resolved early in the discovery process. The Court issued its initial Case Management Order on July 21, 2022, and a more comprehensive Case Management and Scheduling Order on September 23, 2022. [Dkts. 10, 29.]  In this latter Order, the Court set a discovery close of December 1, 2023.

On August 22, 2022, Plaintiff served his first sets of discovery, consisting of nine interrogatories, 28 requests for admission, and 52 requests for production. Plaintiff withdrew these requests for admission as part of the settlement negotiations process. On November 16, 2022, Plaintiff served his second sets of discovery, consisting of two additional requests for production and 31 requests for admission (which included the requests previously withdrawn).

The Parties recognized early on that a settlement was possible, if not likely, and the issues in the case were primarily legal rather than factual. Accordingly, the Parties chose to focus discovery efforts on ascertaining the putative class size and number of text messages at issue,[2] and then, armed with this information, exploring a possible resolution.

### C. Mediation

The Settling Parties agreed to mediation with Rodney Max. This mediation was originally scheduled for December 19, 2022, but was rescheduled to and conducted on January 4, 2023. The Settling Parties left the full-day mediation without a deal. Mr.

---

[2] Importantly, Settlement Agreement contains protections for persons not identified until after the Notice Deadline. Settlement Agreement, § 10.9. "No telephone number (or associated person) identified after the Notice Deadline" is bound to the Settlement Agreement.

Max continued to communicate with the Parties to facilitate a settlement, and a settlement was reached in principle via mediator's proposal on January 6, 2023. Thereafter, the Parties negotiated the contents of the Settlement Agreement.

### D. **The Settlement**

#### 1. **Defined Class**

The proposed Settlement Class is defined as follows:

> Since November 23, 2018, all persons to whose telephone number the AdaptHealth Parties initiated, or had initiated on their behalf, more than one text message in a 12-month period for the purpose of inviting the recipient to order CPAP supplies, after the recipient had replied "stop" or its equivalent to one of the AdaptHealth Parties' text messages

Settlement Agreement, § 3.1. The Settlement Class consists of 32,035 persons who received approximately 220,000 text messages meeting the Settlement Class definition.

#### 2. **Monetary Relief**

The Settlement Agreement requires Defendants to pay $160 to each Settlement Class Member who submits an Approved Claim. Settlement Agreement §§ 2.8; 4.1.1. Defendants have also agreed to separately cover any awarded attorneys' fees and all costs, including administrative costs and attorneys' costs. *Id.* at §§ 5.2; 15.1.

To submit a claim, Settlement Class Members will need to fill out and submit a claim form. This can be done electronically through the Settlement Website or via U.S. mail, including through a postage-paid claims form to be included with the notice. *Id.* § 7.1. The claim forms and notice documents are attached to the Settlement Agreement as Exhibits 1-4. Checks (or electronic payment, at the Approved Claimant's election)

will be issued to those persons who submitted Approved Claims within thirty (30) days of the Final Settlement Date. *Id.* § 7.5.1. These checks will be valid for 180 days. *Id.* § 4.1.2.

### 3. Redistribution and Cy Pres

Should checks remain uncashed after 180 days of the first distribution, the amount will be distributed *cy pres* to the National Consumer Law Center, subject to Court approval. *Id.* § 4.1.3.4. Unless final approval is not granted or is granted but reversed on appeal, no amount deposited with the Settlement Administrator and intended to be used to as a Cash Award on an Approved claim may revert or otherwise be returned to Defendants. *Id.*

### 4. Release

Upon Final Approval, members of the Settlement Class who do not opt out will have released all Released Claims against each and every one of the Released Parties. *Id.* § 10, *et seq.*. Plaintiff and the Settlemenet Class Members further agree not to sue any of the Released Parties with respect to any of the Released Claims, and agree to be forever barred from doing so in any court of law or equity, arbitration proceeding, or any other forum. *Id.* § 10.6.

### 5. Service Awards

While Plaintiff's service to the Class and this case was excellent and deserving of a service award, recognizing recent 11th Circuit precedent, Plaintiff does not request any service or incentive award in this matter. *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244 (11th Cir. 2020), *rehearing denied en banc, Johnson v. NPA Sols. LLC*, 43 F.4th 1138

(11th Cir. 2022).

### 6. Attorneys' Fees and Costs

Class Counsel intends to apply to the Court for an award of attorneys' fees and costs. *Id.* § 15.1. As will be addressed in more detail in Class Counsel's forthcoming Motion for Attorneys' Fees, to be filed on the schedule set by the Court, Class Counsel intends to ask for $1,281,400 in fees, which is 25% of the cash value of the Settlement Relief,[3] and costs of approximately $14,000. This 25% request is the benchmark in common fund cases in the 11th Circuit. *Camden I Condo Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991).

The Settlement is not contingent upon the Court's approval of attorneys' fees or costs, and the notice to Settlement Class Members will explain that Class Counsel intends to seek up to 25 percent of the cash value of the Settlement Relief, and their actual costs. Any awarded Attorneys' Fees and Costs will be paid separately and will not reduce the amount paid to Settlement Class Members. *Id.* at § 15.1. Defendants reserve the right to object to any petition for Attorneys' Fees and Costs. *Id.*

### 7. Administration, Notice, and Claims

The Claims Administrator will be Kurtzman Carson Consultants, LLC ("KCC"). All costs of notice and administration shall be paid by Defendants. *Id.* § 5.2. The Claims Administrator shall administer the Settlement, which includes, but is not limited to, processing claims, disseminating notice pursuant to the plan submitted

---

[3] In the 11th Circuit, claims-made settlements are valued at the total amount made available to class members. *See, e.g. Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007).

herewith, maintaining records, providing reports to Class Counsel and Defendants'
counsel, creating the settlement website, establishing and maintaining the toll-free
telephone number, and issuing all payments contemplated herein. *Id.* at § 5.

No later than thirty (30) days after a Preliminary Approval Order is issued, the
Administrator will provide mailed notice, with a prepaid claim form, to Settlement
Class Members Settlement Agreement, §§ 6.2, 6.3.

Settlement Class Members will be permitted to submit a claim, object, or opt
out for 60 days after the Notice Deadline. *Id.* at §§ 2.18.3-5.

A draft of all notice documents are included as Exhibits 1-4 to the Settlement
Agreement.

## III.   DISCUSSION

### A. <u>Legal Standard for Preliminary Approval</u>

"Rule 23(e) … permits approval of a class action settlement if the settlement is
'fair, reasonable, and adequate.'" *Holman v. Student Loan Xpress, Inc.*, 2009 U.S. Dist.
LEXIS 113491, *14 (M.D. Fla. Nov. 19, 2009) (citing *Strube v. Am. Equity Inv. Life Ins.
Co.*, 226 F.R.D. 688, 697 (M.D. Fla. 2005). In deciding whether to preliminarily
approve a settlement, courts consider

> (1) the influence of fraud or collusion on the parties' reaching a
> settlement, (2) "the likelihood of success at trial," (3) "the range of
> possible recovery," (4) "the complexity, expense[,] and duration of
> litigation, (5) "the substance and amount of opposition to the settlement,"
> and (6) "the stage of proceedings at which the settlement was achieved."

*Holman*, 2009 U.S. Dist. LEXIS at *15 (citing *Bennett v. Behring Corp.*, 737 F.2d 982,
986 (11th Cir. 1984)) (hereinafter, "Bennett Factors").

7

### B. <u>Preliminary approval is warranted.</u>

#### 1. **There was no fraud or collusion in reaching the settlement.**

"Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Hanley v. Tampa Bay Sports & Ent'mt LLC*, 2020 U.S. Dist. LEXIS 89175, *10 (M.D. Fla. Apr. 23, 2020) (citing *Saccoccio v. JP Morgan Chase Bank*, N.A. 297 F.R.D. 683, 691 (S.D. Fla. 2014)). This case was resolved on a mediator's proposal from an exceptionally well-respected mediator after the Parties failed to reach a resolution during an all-day mediation session. [Dkt. 43.] Accordingly, there was no fraud or collusion in reaching the settlement.

#### 2. **Success at trial is uncertain.**

The "likelihood of success at trial" is "the most important factor in evaluating a class action settlement." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1323 (S.D. Fla. 2007). Here, that success is far from certain on several levels.

First, Defendants' motion to dismiss raised several issues of near-first impression regarding the constitutionality of the FTSA, addressed previously by only a few sister courts. Had this case proceeded, it is very possible that this Court, an intervening opinion from the 11th Circuit, the Supreme Court,[4] or modification to the law would have resulted in the FTSA claim being lost altogether.

Second, there is an open question of whether Defendants' text messages are

---

[4] In fact, there is a pending Supreme Court case that will address the scope of the Dormant Commerce Clause, which is an area on which Defendants focused in its motion to dismiss Plaintiff's FTSA claim. *See National Pork Producers Council v. Ross*, 21-cv-468, argued on October 11, 2022.

exempt from the TCPA under the "emergency purposes" exception or any other healthcare exception, whether the FTSA contains such an exception, and how the messages being post "stop" impacts this analysis. Courts have decided related questions with conflicting results. *Compare, e.g. Coleman v. Rite Aid of Georgia, Inc.*, 284 F. Supp. 3d 1343, 1346-47 (N.D. Ga. 2018) (concluding the emergency purpose exception cannot apply where the recipient has informed the caller it had the wrong number or the calls were unwanted) *with Roberts v. Medco Health Solutions*, 2016 U.S. Dist. LEXIS 97177, *3 (E.D. Mo. July 26, 2016) (applying emergency purpose exception to wrong number calls).

Third, there is an open question about whether cell phone numbers are properly allowed on the Do-Not-Call Registry in the first place. While 11th Circuit courts are presently bound by the Hobbs Act to follow the FCC's determination that they are, several recent Supreme Court and 11th Circuit cases have suggested that the FCC exceeded its authority and that Hobbs Act deference in such situations may be on the way out. *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051 (2019); *Gross Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1105-12 (11th Cir. 2019) (Pryor, J., concurring); *Turzio v. Subway Franchisee Adver. Fund Trust LTD.*, 2022 U.S. Dist. LEXIS 89622, *27-31 (S.D. Fla. May. 18, 2022). Should this come to pass, it is possible Plaintiff and Settlement Class Members lose altogether on the National Do-Not-Call Registry claim.

Fourth, under the TCPA provisions at issue, damages are "up to" $500 per text rather than the $500 minimum per text found in other provisions of the statute.

*Compare* 47 U.S.C. § 227(c)(5) *with* 47 U.S.C. § 227(b)(3). Defendants' position has been that the text messages at issue were due to a software glitch. While the Parties strongly disagree (and would continue to disagree) about Defendants' level of culpability for such a glitch, such a "glitch" might result only in nominal damages.

Finally, given the novelty of some of these issues, any success at trial would need to be maintained throughout lengthy appellate litigation.

Accordingly, "the uncertain path to recovery suggests that the Settlement Agreement may represent the better alternative for Plaintiff and the class versus continued litigation." *Hanley*, 2020 U.S. Dist. LEXIS at *11.

### 3.  The recovery under the settlement is substantial.

"The second and third considerations of the *Bennett* test are easily combined. A court first determines the range of recovery by resolving various damages issues. The court then determines where in this range of possible recovery do fair, adequate, and reasonable settlements lie." *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 541 (S.D. Fla. 1988). "The range of possible recovery spans from a finding of non-liability to a varying range of monetary and injunctive relief." *Saccoccio*, 297 F.R.D. at 593. "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Behrens*, 118 F.R.D. at 542.

The Settlement Agreement here provides excellent recovery to Settlement Class Members, especially in comparison to other TCPA settlements. Damages at trial range from $0 (on a finding of non-liability and/or that no damages were warranted due to the glitch) to more than $100 million, on a finding of full-liability and a full $500 per

10

text. But the $100 million number is almost certainly illusory for two reasons. First, on a factual basis, Defendants' text messages appear to be the result of a glitch, and a juries' determination as to Defendants' level of culpability for that glitch would likely drive whether any damages award are nominal or significant. Second, even if damages skewed toward the significant, there remain constitutional concerns about such a large damages award. *See Wakefield v. Visalus*, 51 F.4th 1109, 1120 (9th Cir. 2022) (remanding mandatory nine figure TCPA damages award for consideration of whether those damages violate Due Process).

Despite these concerns, to the best of Class Counsel's knowledge, the relief here exceeds the relief in many other approved TCPA settlements. A sample of such approved settlements is shown here:

| Case | Per Claimant Recovery |
|---|---|
| *Couser v. Comenity Bank* 125 F. Supp. 3d 1034 (S.D. Cal. 2015) (collecting other settlements) | $13.75 |
| *Ott v. Mortg. Inv'rs Corp. of Ohio, Inc.*, 2016 U.S. Dist. LEXIS 892 (D. Or. Jan. 5, 2016) | $140.86 |
| *Franklin v. Wells Fargo Bank, N.A.*, 2016 U.S. Dist. LEXIS 13696 (S.D. Cal. Jan. 29, 2016) | $71 |
| *Gehrich v. Chase Bank* 316 F.R.D. 215 (N.D. Ill. 2016) | $52.50 |
| *Somogyi v. Freedom Mortg. Corp.*, 495 F. Supp. 3d 337, 345 (D.N.J. 2020) | $75.30 |
| *Lalli v. First Team Real Estate—Orange Cnty*, 2022 U.S. Dist. LEXIS 161756 (C.D. Cal., Sept. 6, 2022) | $110[5] |

---

[5] Described by the court as a "strong result." *Id.* at *30.

11

As one court has recently noted, most TCPA settlements result in a "range from $20 to $100 per-class member." *Retina Assocs. Med. Group. v. Keeler Instrumenets*, 2019 U.S. Dist. LEXIS 239998, *10 (C.D. Cal. Dec. 13, 2019). Indeed, in a court-created chart in another TCPA settlement, of the 12 cases listed, only one had a higher per-claimant award than the $160 per-claimant award here, and that was only because that case had a sub-2% claims rate (whereas here, all claimants receive $160 whether the claims rate is 1% or 100%). *See Ward v. Flagship Credit Acceptance LLC*, 2020 U.S. Dist. LEXIS 25612, Appendix A (E.D. Pa. Feb. 13, 2020).

Settlements that resulted in "better" per-claimant relief typically did so only after years of litigation and after the case was all but won for the plaintiff. For example, *Chinitz v. Intero Real Estate Servs.*, 18-cv-5623 (N.D. Cal), upon which this Settlement was structurally modeled, was a TCPA case with a similar class size (37,962 vs 32,035), a similar number of communications (171,000 vs 220,000), but which was *much* further along. It had been litigated for over three years at the time of settlement, with a certified a class and favorable-to-the-class rulings on multiple motions for summary judgments. *See Chinitz v. Intero Real Estate Servs.*, 2022 U.S. Dist. LEXIS 196781, *2-5. *Intero* settled for $350 per class member. While the relief per-class member here is approximately half of what *Intero* obtained, considering the efficiency of the settlement *and* the remaining risks, the result is strong.

Accordingly, the Settlement here falls within the range of reasonableness.

### 4. Continued litigation would be lengthy, complex, and expensive.

As discussed above, this case presented novel—and often near first

impression—legal issues that, if resolved in Defendants' favor, would bar recovery altogether, and if resolved in Plaintiff's favor, would nevertheless result in uncertain damages. Furthermore, regardless of which side prevailed, and regardless of any damages awarded, appeals would almost certainly follow, given the ever-shifting TCPA landscape, the novel issues presented, and the scarcity of court decisions on the FTSA.

### 5. At this stage, there is no opposition to the settlement.

As notice has not yet been provided, there is no opposition to the Settlement from Settlement Class Members.

### 6. The case settled early, but at an "inflection" point.

"The stage of the proceedings at which settlement is achieved is 'evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation.'" *Saccoccio*, 297 F.R.D. at 694. "Early settlements are favored", such that "vast formal discovery need not be taken." *Id.*

The case here settled early and before "vast formal discovery" was taken, but it did so at a natural time in the case. The main issues moving forward in this case were the constitutionality of the FTSA, an issue which would almost certainly result in appeals either way; class certification; and damages under the TCPA.[6] Defendants' constitutionality arguments were fully briefed and ripe for determination by this Court.

---

[6] This is not to say that there were no other issues, but these issues were the three that both Parties agreed would drive the future of this case.

[Dkt. 33.] Discovery was not set to close until December 2023, which means class certification briefing would likely not occur until early 2024. Damages would, of course, necessitate a trial. Even at this early stage, there were no secrets as to the Parties' positions on these issues moving forward. As such, with all Parties' cards down, it made sense to explore a resolution before significant time and expense was spent on discovery.

To do so, the Parties attended an all-day mediation with a respected mediator familiar with the TCPA. After hearing the Parties' explain their respective positions and fail to reach an agreement, the case resolved on the mediator's own proposal.

Accordingly, this factor weighs in favor of Settlement.

## IV.   Conditional certification of the Settlement Class is appropriate.

"A class may be certified 'solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006). In the settlement context, "the requirements of Rule 23, Federal Rules of Civil Procedure, that serve 'to protect absentees by blocking unwarranted or overbroad class definitions []demand undiluted, even heightened attention in the settlement context." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Plaintiff bears "the burden of establishing that each requirement of Rule 23(a) and at least one requirement of Rue 23(b) is satisfied."

Plaintiff respectfully requests that the Court provisionally certify the class defined in the Settlement Agreement to allow Settlement Class Members to be provided notice of the Settlement and their rights thereunder. Defendant has agreed to

14

provisional certification of the defined Settlement Class for the purposes of settlement.[7]

For reference, the Settlement Class is defined as:

> Since November 23, 2018, all persons to whose telephone number the AdaptHealth Parties initiated, or had initiated on their behalf, more than one text message in a 12-month period for the purpose of inviting the recipient to order CPAP supplies, after the recipient had replied "stop" or its equivalent to one of the AdaptHealth Parties' text messages.

### A. **Rule 23(a) is Satisfied.**

Rule 23(a) requires (i) that the proposed class is so numerous that joinder of all individual class members is impracticable (numerosity); (ii) that there are common questions of law and fact amongst class members (commonality); (iii) that the proposed representative's claims are typical of those of the class (typicality); and (iv) that both the named-representative and his or her counsel have and will continue to adequately represent the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

#### 1. **Numerosity.**

In the 11th Circuit, the numerosity requirement is generally satisfied when the number of class members exceeds 40. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Numerosity is met for the proposed class. Defendants' records indicate that the proposed class has 32,035 members. Defendants ascertained this information through a review of its outbound and inbound texting records, and in accordance with Plaintiff's discovery requests and guidance. Defendants have represented the same in the Settlement Agreement. Settlement Agreement, § 3.1.

---

[7] Defendants do not contest certification of the Settlement Class for the purposes of this Settlement, but reserve the right to do so should the Settlement Agreement not finalize and the litigation proceed in ordinary course to a Motion for Class Certification.

Importantly, to the extent this 32,035 is an undercount and more than 40 additional telephone numbers affected, those additional persons will not be bound by the Settlement absent a supplemental settlement agreement. *Id.* at § 10.9.

### 2. Commonality.

Rule 23(a)(2) requires that there be questions of law or fact common to the class. "What matters to class certification … is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 351 (2011). Commonality is met for the Settlement Class because there are numerous questions generating common answers, including, but certainly not limited to, (i) whether and why Defendants system was set up to, and did, send text messages to Settlement Class Members after Defendants were asked stop; (ii) whether Defendants text messages were telemarketing; and (iii) whether the "emergency purposes" or another exception still applies to wrong number calls. These questions are all susceptible to generalized proof and would drive the resolution of the matter for the Settlement Class as a whole.

### 3. Typicality.

Rule 23(a)(3) requires that the class representative's claims be "typical of the claims … of the class." Fed. R. Civ. P. 23(a)(3). "Typicality 'focuses on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Benson v. Enter Leasing Co.*, 2021 U.S. Dist. LEXS 101057, *13 (M.D. Fla. May 11, 2021) (Dalton, J.)

Plaintiff's factual basis and legal theories are identical to that of the rest of the class: that he asked Defendants, via text message, to "stop" texting him, that Defendants continued to do so, and that these post-"stop" messages violate both the TCPA and the FTSA. [Dkt. 55.]

### 4.  Adequacy.

Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the Class." Fed. R. Civ. P. 23(a)(4). This requirement applies to both the named plaintiff and counsel. *Amchem Prods. v. Windsor*, 521 U.S. 591, 626, n. 20 (1997). The adequacy requirement is met here.

With respect to the proposed class representative, this inquiry "serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Id.* at 625. "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625-26. This requirement tends to merge with the commonality and typicality inquiries, "which serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 626, n.20 (quotations and citations omitted).

Plaintiff here has remained diligent and involved throughout this litigation. Plaintiff and his counsel are in frequent communication about all aspects of the case. Plaintiff has remained readily available throughout; has asked incisive questions; has reviewed filings; has reviewed, understood, and accepted the class-wide settlement;

has promptly responding to any issues or concerns raised; and at all times has acted in the best interest of the Class rather than himself. Plaintiff has fulfilled, and will continue to fulfill, his duties as representative of the Class.

Proposed Class Counsel also satisfies the adequacy requirement. Attorney Glapion has extensive experience litigating TCPA matters individually and on a class-wide basis. Since founding The Glapion Law Firm in May 2015, Attorney Glapion has been appointed co-lead counsel in *Willis et al. v. IHeartMedia, Inc.*, Case No. 16-CH-02455 (Cook County, Feb. 19, 2016), a TCPA class action in which the court approved an $8.5 million non-reversionary class action settlement, which was successfully administered. In 2017, Attorney Glapion was appointed as sole lead counsel in *Allard et al. v. SCI Direct, Inc.*, a TCPA class action in which the Court approved a $15 million non-reversionary class action settlement, which was successfully administered. Case No. 17-cv-4692 (N.D. Illinois). In 2018, Attorney Glapion was also appointed co-lead counsel in *Griffith v. ContextMedia, Inc.*, Case No. 16-cv-2900 (N.D. Illinois), a TCPA class action in which the Court approved a $2.9 million non-reversionary settlement, which was successfully administered. In 2022, Attorney Glapion was appointed sole lead counsel in *Walker v. Highmark BCBS Health Options, Inc.*, 2020 U.S. Dist. LEXIS 225998 (W.D. Pa. Dec. 13, 2022), a $1.85m non-reversionary TCPA class action settlement which was preliminarily approved and is in the process of being administered. Attorney Glapion has also recovered over $1 million for clients in hundreds of individual TCPA cases. Attorney Glapion's familiarity with the underlying law has and will continue to serve the Settlement Class

18

well. *See* Declaration of Jeremy M. Glapion. Attorney Glapion has never been found to be inadequate counsel.

Co-Class Counsel, Attorney Sohn, has been referred to as being part of the "Miami legal Hall of Fame" by the Hon. Michael Hanzman, after he recently served in a leadership role on the Plaintiffs' Steering Committee for the historic *In re Champlain Towers' South Collapse Litig.* Class action settlement, which resolved with $1.2b in wrongful death compensation fund along with a return of 100 percent of unit appraisal value to property owners. Attorney Sohn also serves as part of the leadership committee for the ongoing *In re NFL Players' Concussion Litig.* He is exceptionally experienced in plaintiffs-side litigation and mass- and class-actions. In the aggregate, Attorney Sohn's aggregate class and individual victim recoveries exceed $2 billion. *See* Declaration of Bradford R. Sohn.

Attorneys Glapion and Sohn have diligently litigated this case. They identified and thoroughly pled viable claims on behalf of Plaintiff DeSouza and the Settlement Class. They served discovery, opposed Defendants' Motion to Dismiss, responded promptly to Court orders and requirements, implemented and handled the strategy that resulted in the strong result here, and participated in the all-day mediation that brought about this settlement.

### B. Rule 23(b)(3) is Satisfied.

To certify a class under Rule 23(b)(3), there must be questions of law or fact common to the proposed class members, which predominate over any questions affecting only individual members, and the class mechanism must be superior to other

available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). In the settlement certification context, manageability of a trial need not be considered. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) (writing "a district court need not inquire whether the case, if tried, would present intractable management problems" in the context of settlement-only class certification.)

### 1. Predominance.

Under Rule 23(b)(3), a class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The 'overarching purpose' of the predominance requirement is to ensure 'that a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Benson*, 2021 U.S. Dist. LEXIS at *17-18 (quoting *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1235 (11th Cir. 2016)). Predominance requires courts "to consider whether the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole predominate over those issues that are subject only to individualized proof." *Benson*, 2021 U.S. Dist. LEXIS at *18 (quoting *Sellers v. Rushmore Loan Mgmt. Servs.*, 941 F.3d 1031, 1040 (11th Cir. 2019). "To determine predominance, courts must: (1) identify the claims and defenses and their elements; (2) classify each as common or individual questions, by predicting how the parties will prove them at trial; and then (3) determine whether the common ones predominate." *Benson*, 2021 U.S. Dist. LEXIS 101057 at *18.

Plaintiff's operative Fourth Amended Complaint has three claims: two under the TCPA and one under the FTSA.

a. <u>47 C.F.R. § 64.1200(c)</u>

Plaintiff's TCPA claims involve two separate violations of regulations promulgated under § 227(c) of the TCPA. To show a violation of § 227(c), Plaintiff must prove that he received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under § 227(c). *See Hand v. Beach Entm't KC*, 456 F. Supp. 3d, 1099, 1119 (W.D. Mo. 2020). The two regulations at issue are found at 47 C.F.R. § 64.1200(c) (relating to the National Do-Not-Call Registry) and § 64.1200(d) (relating to internal do-not-call policies and procedures).

Section 64.1200(c) prohibits a person or entity from initiating any "telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone on the national do-not-call registry[.]" Combining § 227(c) and § 64.1200(c), Plaintiff must prove that 1) in a 12-month period, he received more than one 2) telephone solicitation 3) which Defendants or someone on their behalf initiated 4) to his telephone number on the National Do-Not-Call Registry.

"Telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" 47 C.F.R. § 64.1200(f)(15). Excluded are calls made to any person with that person's prior express invitation or to any person with whom the caller has an established business relationship.

21

Whether Defendants' text message invitations "to order CPAP supplies" after being asked to stop qualify as "telephone solicitations" does not change from Settlement Class Member to Settlement Class Member, but is instead a question of generalized applicability.

Identifying which post-stop text messages were sent to numbers on the National Do-Not-Call Registry would be a simple matter of using an automated process to cross-reference the entire class list against the National Do-Not-Call Registry.

Finally, there is no predominance issue regarding which Class Members received more than one message, as the Class definition is limited to such persons, and such persons can be readily ascertained from Defendants' records. Common issues thus predominate.

b. TCPA § 64.1200(d)

Section 64.1200(d) requires that companies implement minimum policies and procedures for maintaining an internal do-not-call list prior to making any telemarketing call. 47 C.F.R. § 64.1200(d). The rule, as currently codified, states:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber[8] unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d).

For Plaintiff to prevail on a claim under § 64.1200(d), he must show 1) he received from or on behalf of Defendants 2) more than one call in a 12-month period

---

[8] In 2003, this was expanded to include calls to cellular telephones. 47 C.F.R. § 64.1200(e).

3) that constitutes telemarketing. Whether Defendants had the required policies and procedures in place is an affirmative defense, given the introduction of those requirements with an "unless" clause, which is considered to be "telltale language … indicative of an affirmative defense." *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 362 (3d Cir. 2015). Nevertheless, it will be discussed.

There is no predominance issue regarding whether a message was from or on behalf of Defendants, as all messages in the class definition were for the purpose of ordering CPAP supplies from Defendants and Defendants do not contest that those messages were sent by them or on their behalf.

As discussed above, there is no predominance issue regarding which Class Members received more than one message, as the Class definition is limited to such persons and such persons can be easily identified from Defendants' records.

"Telemarketing" is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). As with telephone solicitation, this does not change from member-to-member.

Finally, whether Defendants had the required policies and procedures in place is an issue relevant to the class as a whole: Defendants either had them or they did not. This existence or adequacy of these policies and procedures does not change from Class Member to Class Member.

c.  FTSA § 501.059(5)

The FTSA § 501.059(5) prohibits a "telephone solicitor" from initiating

"telephonic sales call" to a consumer who previously asked it to stop. Accordingly, Plaintiff would need to show that (1) Defendants were "telephone solicitors",[9] (2) that their text messages were "telephonic sales calls",[10] and (3) that each class member asked Defendants to "stop" prior to the messages.

The first two issues are indisputably subject to generalized proof. Whether Defendants were telephone solicitors does not change from Settlement Class Member to Settlement Class Member. Similarly, whether Defendants' text messages were "telephonic sales calls" also does not change from member to member. All text messages to putative Class Members were sent for the purpose of "inviting recipients to order CPAP supplies." Whether such messages are "telephonic sales calls" would thus be resolved on a class-wide basis.

The final issue, that each member asked Defendants to "stop", is ostensibly individualized but trivial, relative to the other issues. Defendants maintain records of all inbound and outbound text messages, as well as the names and addresses associated with corresponding phone numbers. Identifying those who received an invitation "to order CPAP supplies" after that person asked Defendants to stop is a simple matter of

---

[9] Defined as "a natural person, firm, organization, partnership, association, or corporation, or a subsidiary or affiliate thereof, doing business in this state, who makes or causes to be made a telephonic sales call, including, but not limited to, calls made by use of automated dialing or recorded message devices." FTSA, 501.059(1)(i).

[10] Defined as "a telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes."

extracting from Defendants' database all telephone numbers which sent to Defendants a stop message and then further identifying which of those numbers continued to receive text messages *after* the stop text. This process could easily be automated and completed with minimal work. Indeed, Defendants have already done so, which is how the Parties arrived at the 32,035 Settlement Class size.

### d. Superiority.

Plaintiff must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Absent class treatment in this case, each individual member of the proposed class would be required to present the same or essentially the same legal and factual arguments, in separate and duplicative proceedings across the country, the result of which would be a multiplicity of proceedings conducted at significant expense to both the judicial system and the litigants. Such a result would be neither efficient nor fair to anyone, including Defendants. Moreover, there is no indication that class members have a strong interest in individual litigation, let alone any incentive to pursue their claims individually. The potential economic payout is small, limited to $500 per text message (with seven being the average number of text messages per class member). *See Benson*, 2021 U.S. Dist. LEXIS 101057 at *23 (noting a small economic payout of less than $6,000 on average supports the superiority of a class action). Indeed, no one else has sued Defendants over their calling practices. There are no manageability issues either—the individual questions are manageable and will not result in mini-trials. On the other hand, permitting this Settlement Class will allow all such persons to obtain

25

compensation in one fell swoop. Fairness, efficiency, and finality favor treating this as a class action.

## V.   The Notice Program Should be Approved.

A court is required to "direct notice in a reasonable manner to all class members who would be bound by [a proposed settlement, voluntary dismissal, or compromise]." Fed. R. Civ. P. 23(e)(1). The notice must be "reasonably calculated … to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Here, Class Counsel proposes a simple notice program that should reach most Class Members because Defendants have contact information for each putative Settlement Class Member.

*First*, within five (5) days of preliminary approval, Defendants will provide to the Settlement Administrator a list of the names, email addresses, and mailing addresses associated with all phone numbers meeting the Settlement Class definition. Settlement Agreement, ¶ 6.1.

*Second*, within thirty (30) days after preliminary approval, the Settlement Administrator will send notice via U.S. mail to Settlement Class Members, in a form substantially similar to Exhibit 2, and via email to Settlement Class Members, in a form substantially similar to Exhibit 3. This notice will provide extensive information to Class Members on the terms of the Settlement, and their rights, obligations, and responsibilities under the Settlement. The notice will define the Class, describe the

options and deadlines for taking action, describe the terms of the proposed Settlement, disclose the sought attorneys' fees, provide information on the time and place of the final fairness hearing as well as information on how to object or opt out, explain the procedures for distributing the settlement funds, and prominently display the address and phone number of the involved attorneys, as well as a toll-free number for making inquiries, and the Settlement website.

Class Members will be able to file a claim via a pre-paid detachable post-card included with the mailed notice, via a claim form that can be requested through the website or from the Settlement Administrator, and directly through the Settlement website. Drafts of the claim form and the proposed notice are attached as Exhibits 1-4 of the Settlement Agreement. "A claim process that involves completing a one-page form and submitting it either online or by mail is not particularly difficult or burdensome." *Poertner v. Gilette Co.*, 618 Fed. App'x 624, 628 (11th Cir. 2015) (per curiam).

Furthermore, KCC has extensive experience administering TCPA settlements, and agrees that "the Notice Plan proposed for this case is consistent with other effective settlement notice programs" and "is the best notice practicable[.]" *See* Declaration of Christie K. Reed, ¶ 15.

Accordingly, the notice program should be approved.

## VI.    CONCLUSION

Plaintiff respectfully requests that the Court 1) preliminarily approve the proposed Settlement; 2) conditionally certify the proposed Class; 3) appoint Plaintiff's

attorney Jeremy M. Glapion of Glapion Law Firm and Brad Sohn of Brad Sohn Law, PLLC as Class Counsel; 4) approve the proposed Notice and Claims program; 5) direct that Notice be provided pursuant to the terms of the Settlement Agreement; 6) establish procedures for members to object to the Settlement or exclude themselves from the Settlement Class; 7) set the deadlines for claims, objections, and exclusions at 60 days after the Notice deadline; 8) stay all proceedings except those related to effectuating the Settlement; 9) schedule a final approval hearing; and 10) set any other dates and deadlines the Court deems necessary, including deadlines for Plaintiff's Motion for Attorneys' Fees and Costs. Specifically, Plaintiffs propose the following schedule:

| | |
|---|---|
| 30 days after order granting Preliminary Approval | Deadline for Notice to be Provided ("Notice Deadline") |
| 25 days after Notice Deadline | Deadline for Fee Petition |
| 60 days after Notice Deadline | Deadline to file objections or request exclusion |
| 60 days after Notice Deadline | Deadline for Members to Submit a Claim |
| 90 days after Notice Deadline | Deadline to file final approval motion and memorandum. |
| 125 days after notice deadline | Final Approval Hearing |

Dated: April 7, 2023       */s/ Jeremy M. Glapion*
                                      Jeremy M. Glapion
                                      **THE GLAPION LAW FIRM, LLC**
                                      1704 Maxwell Drive
                                      Wall, New Jersey 07719
                                      Tel: 732.455.9737
                                      Fax: 732.709.5150
                                      jmg@glapionlaw.com